The plaintiffs, former holders of stock in Alabama By-Products Corporation ("ABC"), appeal from a summary judgment for the defendants on the plaintiffs' claims that the defendants acquired their stock through coercion, fraud, or breach of fiduciary duty. The same claims were presented in a class action in the Delaware Chancery Court of New Castle County, Hynson v. Drummond Corp. (CV 7904, Del. Ch. 1990), and were extinguished in a settlement awarding damages to the plaintiff class. The issue is whether the Hynson judgment bars this action under the doctrine of res judicata or is not binding on these plaintiffs on the basis that the Delaware Chancery Court certified the class without giving class members the right to exclude themselves from the action.[1]
 I.
This dispute concerns the value of the stock of ABC, a Delaware corporation, at the time it was acquired by Drummond Coal Company, Inc., now Drummond Company, Inc. ("Drummond"). In 1977, Drummond, through a subsidiary, acquired a controlling interest in ABC. It thereafter initiated several attempts to merge ABC into Drummond. In response to one such attempt in 1983, several ABC stockholders formed the Shareholders' Protective Committee ("SPC"). The members of the SPC were lawyers and stockbrokers in Birmingham, ABC stock was traded over the counter, and Sterne, Agee Leach, Inc., a Birmingham investment firm, was the principal market maker of ABC stock. A senior member of the firm was one of the members of the SPC. The SPC opposed Drummond's 1983 attempt to merge ABC into Drummond for $65 per share of ABC stock. In 1982, market bid prices for ABC ranged from a high at the beginning of the year of $69 to a low at the end of the year of $44, which is about where it stood on March 17, 1983, when the $65 merger proposal was announced. The SPC obtained information on ABC through a court action, hired an analyst to derive a value for ABC stock, and took the position that the stock was worth more than $100 per share. It sent a detailed explanation of its valuation to the stockholders other than Drummond. Drummond sought an independent evaluation from Kidder, Peabody Co., which informed Drummond that it was "unable to conclude that the consideration . . . is fair from a financial point of view to [the] shareholders." Drummond withdrew the 1983 merger proposal in September.
On December 5, 1984, Drummond made a tender offer to pay $75 per share for all of the shares of ABC that it did not own.[2] The tender offer circular detailed the history of Drummond's acquisition of a majority interest, of its efforts to acquire the remainder of the stock, and of other valuations of the stock, including the SPC's valuation of the *Page 939 
stock at more than $100 per share. The circular stated: "The Offerors[3] believe that the cash price of $75 per Share offered hereby is fair to unaffiliated ABC stockholders." This statement forms the basis of the allegation of fraud against Drummond; the plaintiffs here contend, as did the class representatives in Hynson, that Drummond knew that ABC stock was worth substantially more on an asset valuation basis as opposed to a market valuation. A principal factor in the alleged undervaluation is Drummond's knowledge of the value of ABC's proven coal reserves, its timberland, and its cash flow.
Under another section of the circular, entitled "Additional Purchases of Shares and Possible Merger," Drummond stated: "Upon consummation of the Offer and from time to time thereafter, the Offerors and their affiliates will consider alternatives available to them to satisfy their ultimate goal of achieving ownership of the entire equity interest in ABC." Drummond said it might purchase additional shares or it might propose a merger, with the "timing, structure and terms of any merger" to be determined by Drummond later. The circular also stated that, if Drummond acquired 90% or more of the ABC stock, "it could effect a merger with [ABC] on any terms it chose." The following section of the circular, "Effects of Offer, Additional Purchases of Shares and Possible Merger; Future Plans for the Company," stated that Drummond might "propose to the Board of Directors of [ABC] that it consider reduction or elimination of dividends." By the time of the tender offer, Drummond had voting control of the board of directors of ABC — a majority of its members had been placed by Drummond through its control of a majority of the ABC stock.
These representations of an uncertain future for non-tendering shareholders, including the possibility of holding stock that did not pay dividends and would probably not be marketable, form the basis of the allegations by the plaintiffs here and in Hynson that the tender offer was coercive.
The board of directors of ABC met quickly in response to the tender offer. Charles Adair, the president and chief executive officer of ABC, who had taken office after Drummond had acquired the majority of the ABC stock and who had previously been Garry Drummond's executive assistant, was in Washington, D.C., the day the tender offer was announced. Adair flew back to Birmingham on a Drummond Company airplane the next day, and a meeting of the ABC board of directors was held at the Drummond Company hangar. The board of directors of ABC voted to take a neutral position on the tender offer. This action, coupled with the board's alleged failure to inquire into the fairness of the offering price or any other aspects of the tender offer, is the basis of the allegations of breach of fiduciary duty against the board members who are the individual defendants in this action and who were defendants inHynson.
On December 18, the SPC wrote a letter to many of the ABC stockholders indicating its opposition to the tender offer and stating, "The Committee continues to believe that the ABC stock has a value of not less than $100 per share." Among the reasons given by the SPC for its belief that "the disclosures made by Drummond are not adequate" were that "Drummond has not given consideration to the liquidation value of ABC"; "Drummond has failed to inform the public stockholders of ABC as to the value of the coal resources and reserves of ABC"; "ABC has approximately 60,000 acres of timberlands," the value of which was not disclosed by Drummond; and Drummond's income projections for ABC were low. In short, the very points now alleged as bases for the fraud allegations were known to the ABC stockholders at an early stage in the tender offer, if not before.
Enough ABC shareholders responded to the tender offer that Drummond acquired through the tender offer, together with the stock it already owned, approximately 91% of the outstanding stock of ABC. It effected a short-form merger in August 1985 and acquired, for $75.60 per share, the remainder, except that some of the remaining ABC stockholders filed for an appraisal and obtained a higher price, as explained below. The plaintiffs in the actions below, appellants *Page 940 
here, owned ABC stock that Drummond acquired either through the tender offer or through the merger.
On January 4, 1985, less than a month after Drummond made the tender offer, several ABC stockholders filed a class action,Hynson v. Drummond Coal Co., supra, in the Delaware Chancery Court of New Castle County on behalf of a class of all ABC stockholders other than the defendants. On December 3, 1985, several shareholders who did not tender their shares and who objected to the merger filed an action in the Delaware Chancery Court of New Castle County for a judicial appraisal of their shares. Neal v. Alabama By-Products Corp., CV No. 8282 (Del.Ch. 1990).[4] The Neal plaintiffs were excepted from the Hynson class. Many of the plaintiff ABC shareholders tendered some shares, surrendered some in the merger, and held some for appraisal, or otherwise deliberately took advantage of two of these three options.
In a settlement of Hynson in November 1989, Drummond agreed to pay about $5,000,000, approximately an additional $5 per share of ABC stock. Notice of the settlement was mailed to the class members on November 29, 1989. The notice did not give the class members a right to opt out, but it did provide the following:
 "Any member of the Class who objects to the certification of the Class, the Stipulation, the Settlement, the judgments with respect thereto, and/or the award of attorneys' fees and expenses to plaintiffs' counsel, or who otherwise wishes to be heard, may appear in person or by his attorney at the Hearing and present any evidence or argument that may be proper and relevant. . . .
 "Any person who fails to object in the manner prescribed above shall be deemed to have waived such objection and shall be forever barred from raising such objection in this or any other action or proceeding."
On February 1, 1990, a hearing was held on the Hynson
settlement, and no class member objected to the settlement or requested exclusion from the action. The Delaware Chancery Court entered a judgment approving the settlement and enjoining any class member from bringing any other action asserting any of the settled claims against any of the defendants.
Meanwhile, the Neal appraisal action had been tried from June 17, 1989, through July 7, 1989. The Delaware Chancery Court did not enter a judgment until August 1, 1990, when it found an appraised value of $180.67 per share. That judgment was affirmed. Alabama By-Products Corp. v. Neal, 588 A.2d 255 (Del. 1991).
The Neal valuation prompted the instant actions. The first complaint was filed by John H. Martin; amendments to his complaint added approximately 336 named plaintiffs.[5] Arthur B. Durkee, Jr., and others filed motions to intervene and complaints in intervention. AmSouth Bank, as trustee of a number of trusts owning ABC stock, also filed a motion to intervene and filed a complaint in intervention. All plaintiffs had been members of the Hynson class. The defendants named in these complaints had all been defendants in Hynson. The allegations of wrongdoing in these present cases are essentially the same as those made in Hynson.
 II.
In Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811,105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985), the United States Supreme Court held that "a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess theminimum contacts with the forum which would support personal jurisdiction over a defendant" (emphasis added). The Court further held:
 "If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law,[3] it must provide minimal procedural due process protection. The plaintiff must receive *Page 941 
notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'. . . . The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members.
Id., at 811-12, 105 S.Ct. at 2974 (citations omitted; emphasis added).[6] The plaintiffs rely on the emphasized language quoted above from Phillips Petroleum v. Shutts to contend that, because the Delaware Chancery Court failed to give them, as absent class plaintiffs,[7] the right to opt out of Hynson, its judgment does not bind them and does not bar their Alabama actions on the same subject matter. The Jefferson County Circuit Court entered a summary judgment for the defendants, holding that the res judicata effect of the Delaware judgment bars these actions.
 III.
The parties argue at length regarding the Shutts statement that due process requires that a plaintiff class member in a class action for money damages be given a right to opt out of the action. The majority of this argument becomes irrelevant, however, when we start from the proposition emphasized in our first quotation from Shutts, which indicates that its holding pertains when the plaintiff class members do not have such contacts with the forum state as would support an exercise ofin personam jurisdiction over a defendant. The plaintiffs have such contacts here, consisting of: their ownership of stock in a Delaware corporation; the fact that Hynson concerned the value of that stock; and their participation in Hynson, indicating submission to the Delaware court's jurisdiction. Furthermore, they received all of the due process components required by Shutts — notice, an opportunity to be heard, the best practicable notice, a description of the action and their rights in it, and adequate representation — lacking only an express right to opt out. The Delaware Supreme Court, however, had provided, in Nottingham Partners v. Dana, 564 A.2d 1089
(Del. 1989), a discretionary right to opt out even in class actions that did not give an absolute right to opt out, and none of these plaintiffs objected to the failure to give a right to opt out or requested the Hynson court to allow them, within its discretion, to opt out. For all these reasons, the plaintiffs should not now be allowed to collaterally attack theHynson judgment.
 IV.
Both Delaware and Alabama have adopted the federal class action rules. Relevant here is the distinction between certification of classes pursuant to Rule 23(b)(1), *Page 942 
(b)(2), and (b)(3), Del.Court of Chancery Rules:
 "(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:
 "(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
 "(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
 "(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
 "(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
 "(3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
 "(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
 "(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
 "(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;
 "(D) The difficulties likely to be encountered in the management of a class action."
Rule 23(c)(2) imposes heightened requirements for class actions maintained pursuant to Rule 23(b)(3), including the right to opt out:
 "(2) In any class action maintained under paragraph (b)(3), the Court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that:
 "(A) The Court will exclude him from the class if he so requests by a specified date;
 "(B) The judgment, whether favorable or not, will include all members who do not request exclusion; and
 "(C) Any member who does not request exclusion may, if he desires, enter an appearance through his counsel."
When a class action is maintained pursuant to Rule 23(b)(1) or (b)(2), Rule 23(c)(3) contemplates that members will not be given the opportunity to opt out, but, on the contrary, that all members will be bound by the judgment:
 "(3) The judgment in an action maintained as a class action under paragraph (b)(1) or (b)(2), whether or not favorable to the class, shall include and describe those whom the Court finds to be members of the class. The judgment in an action maintained as a class action under paragraph (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in paragraph (c)(2) was directed, and who have not requested exclusion, and whom the Court finds to be members of the class."
(Emphasis added.) The corresponding provisions of Rule 23 in the Alabama and Federal Rules of Civil Procedure are substantially identical.
The Hynson court certified the class as a Rule 23(b)(1)(A) and a Rule 23(b)(2) class. All plaintiff class members were given notice of the action, although, as stated above, the notice did not inform the class members that they could opt out of the class. *Page 943 
 V.
After Martin and the other plaintiffs filed these actions, the defendants filed in Hynson a motion pursuant to Rule 60(b)(3) and Rule 23, Del.R.Civ.P., for an order confirming that Hynson was properly certified as a class action under Rule 23(b)(1) and (b)(2). Chancellor Allen, who presided over theHynson proceedings, acknowledged that the question whether the judgment in Hynson barred the actions at issue here "is ultimately a question of federal law that is to be answered in the first instance by the courts of the State of Alabama." He nevertheless entertained what he described as "this procedurally unusual motion," because "these claims cast a shadow on this court's processes," because he had not addressed the certification issue in writing during the pendency ofHynson, and because "it may be helpful to later courts to have this court's view." He entered an order on June 14, 1991, which is reported as Hynson v. Drummond Coal Co., 601 A.2d 570
(Del.Ch. 1991); the above-quoted remarks appear at p. 571. We respectfully acknowledge Chancellor Allen's efforts toward resolving this dispute, and we appreciate his views.
Chancellor Allen expressed the question and his resolution of it thus:
 "The central question raised by this motion is of general importance. It is whether a single jurisdiction with in personam jurisdiction over the corporation and all of its directors may, in a single action, conclusively adjudicate whether a corporation's directors have satisfied their fiduciary duties to the corporation and its shareholders in the context of a corporate merger or other corporate transaction. See Nottingham Partners v. Dana, Del.Supr., 564 A.2d 1089 (1989); In the Matter of Colt Indus. Shareholders'
[Shareholder] Litig., 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160 (1991).
 "This question was left unanswered by the Supreme Court of the United States in Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). In Shutts the Supreme Court held that, so long as class members are afforded an opportunity to 'opt-out' of the action, the due process clause does not require that all members of a plaintiff class have such 'minimal contacts' with the forum jurisdiction as would sustain in personam jurisdiction over each class member under the analysis of International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). See Shutts, 472 U.S. at 812, 105 S.Ct. at 2974. The court noted its holding was 'limited to those class actions concerning claims wholly or predominately for money judgments. We [the Supreme Court] intimate no view concerning other types of actions, such as those seeking equitable relief.' Shutts, 472 U.S. at 811 n. 3, 105 S.Ct. at 2974 n. 3.
 "In this action, absent plaintiff class members were afforded no right to opt-out. This case therefore raises the question that the presence of such a right eliminated in Shutts: whether, in order to be preclusively bound by a judgment in a properly conducted Rule 23(b)(1) or (b)(2) action (in which no opt-out option is provided), a member of the class must have a sufficient nexus with the rendering jurisdiction as to make permissible exercise of in personam jurisdiction over that person, with respect to the claims in issue? The question as it arises here is, of course, not so general as that. This case involves a particular class of litigation: stockholder action against corporate fiduciaries. That fact supplies important context for addressing the subsidiary question: whether ownership of corporate stock itself constitutes such a relationship with the corporate domiciliary jurisdiction that it is fair to subject the holder of stock to that jurisdiction for the purpose of adjudicating the existence or contours of corporate rights that attach to stock ownership.
 "For the reasons set forth below, considerations both of efficiency and fairness in our federal system, in my opinion, require that a single adjudication be available in which charges of breach of a director's or controlling shareholder's duty to a corporation and its shareholders may be conclusively determined and all holders of stock bound. It is further my view, as explained below, that where the issue is whether a plaintiff class may be bound to an adjudication of the equitable duty of loyalty created *Page 944 
by the law of the incorporating state, that the purchase (or merely holding) of the shares of a corporation of that state itself creates a sufficient relationship with that jurisdiction to permit that jurisdiction to be one in which rights attaching to stock of the corporation may be conclusively adjudicated."
601 A.2d at 571-72.
Chancellor Allen also expressed his conclusion as follows:
 "In my opinion, the device of a properly administered class action may be employed, without affording opt-out rights, to bind all absent shareholder/plaintiffs to a final judgment in an action seeking to vindicate rights attaching to corporate stock, whether those rights are sought to be protected by injunction or compensated by an award of money."
601 A.2d at 575. Without detailing all of Chancellor Allen's reasoning, we note the following point he expressed:
 "The traditional rule (and still the rule by statute with respect to Delaware corporations)[n.] is that stock has its legal situs in the domiciliary jurisdiction. See 11 W. Fletcher, Cyclopedia Corporations, § 5101 (Perm. ed. 1982). [n.] See 8 Del.C. § 169 (1983)."
601 A.2d at 576.
 VI.
Chancellor Allen's reliance on these plaintiffs' stock ownership as giving the Delaware court jurisdiction over them presents a possible problem of compliance with Shaffer v.Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). InShaffer, the United States Supreme Court held that Delaware's assertion of jurisdiction over a dispute between stockholders and the directors of the corporation by sequestering the directors' stock in the Delaware corporation violated the "minimum contacts" requirement of International Shoe Co. v.Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Court held that the defendants' ownership of stock in a Delaware corporation did not give jurisdiction to the Delaware courts over the defendants where the dispute had nothing to do with the corporate stock.[8] Although the Court disapproved the use of such quasi in rem jurisdiction to attach the defendants' property and to make them subject to personal jurisdiction to avoid loss of that property where the property had nothing to do with the cause of action, it said that the argument for applying International Shoe's "minimum contacts" test to assertions of in rem jurisdiction
 "does not ignore the fact that the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation. For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction. . . .
 "It appears, therefore, that jurisdiction over many types of actions which now are or might be brought in rem would not be affected by a holding that any assertion of state-court jurisdiction must satisfy the International Shoe standard. For the type of quasi in rem action typified by Harris v. Balk [, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023
(1905),] and the present case, however, accepting the proposed analysis would result in significant change. These are cases where the property which now serves as the basis for state-court jurisdiction is completely unrelated to the plaintiff's cause of action."
433 U.S. at 207-09, 97 S.Ct. at 2581-82 (footnotes omitted).
Thus, it at least appears that Shaffer may be distinguishable on the basis that the ownership of stock in ABC is directly related to the cause of action. The Court of Appeals for the Third Circuit held in Grimes v. Vitalink Communications Corp.,17 F.3d 1553 (3d Cir.), *Page 945 
cert. denied, ___ U.S. ___, 115 S.Ct. 480, 130 L.Ed.2d 393
(1994):
 "An appropriate basis for the Delaware court's power to bind non-resident shareholders in such a proceeding is ownership of Vitalink stock[6] together with any other activity engaged in by the members of the class pursuant to their shareholder rights. Thus, in this collateral attack we are concerned with whether the Delaware Court of Chancery had specific jurisdiction to bind non-resident members of the plaintiff class like Holbrook.
 "In the present case, plaintiff Holbrook and all other class members owned stock in Vitalink, a Delaware corporation. Nevertheless, we need not decide whether the single act of purchasing and owning stock in a Delaware corporation would provide sufficient contacts for the state court to exercise specific jurisdiction over every member of the class because the record discloses that Holbrook had an important further contact with the Delaware forum. By surrendering his shares in response to the tender offer with knowledge of his status as a member of the plaintiff class in a pending class action lawsuit containing all the attendant procedural protections designed to ensure that only a fair and adequate settlement judgment would be entered by the court, Holbrook purposefully availed himself of the privilege of having the Delaware Court of Chancery finally, and in a single lawsuit, determine the adequacy of the settlement agreement, 'thus invoking the benefits and protections of its laws.' Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).
17 F.3d at 1559-60.
A detailed record was built in this case of the acts taken by each former stockholder who is a plaintiff here in response to the notices sent them in Hynson.[9] Several of the plaintiffs here were also plaintiffs in Neal, having held some of their stock for an appraisal after either tendering some of it in response to the tender offer or surrendering some of it in the merger. Thus, they purposefully availed themselves of the benefits of the law of Delaware by invoking its statutory appraisal procedure as to part of their stock. Others among the plaintiffs, principally the AmSouth trusts, filed proofs of claims in Hynson. They counter Drummond's argument on this point by noting that they were members of the class without having filed such proofs of claims and arguing that their filings were therefore insignificant, but we deem them significant as showing an intent to submit to the jurisdiction of the Hynson court. A much larger number of the plaintiffs here returned W-9 forms, by which they prevented "backup withholding" of federal income tax from their settlement proceeds. Again, the plaintiffs contend that the returning of these forms was inconsequential to the Delaware court's jurisdiction, but again we disagree. The plaintiffs, by returning these forms, expressed an interest in receiving proceeds from the Hynson settlement — indeed, they affirmatively indicated they wanted to receive 100% of those proceeds, not just 80%.
 VII.
Significantly, the Supreme Court of Delaware had provided, before Hynson was filed, a mechanism whereby a right to opt out may be provided even if the chancery court certifies the action as a Rule 23(b)(2) action. That court held, in NottinghamPartners v. Dana, 564 A.2d 1089 (Del. 1989), that an action for both injunctive and monetary relief may be certified as a (b)(2) action, provided that monetary relief is not the predominant remedy. *Page 946 
 "The Court of Chancery found that although the Dana complaint contained an alternative prayer for damages, the primary relief sought and obtained in the Settlement was declaratory, injunctive and rescissory. Thus, the Court of Chancery found that the Dana action satisfied the second (b)(2) requirement of primarily seeking similar equitable relief with respect to the class as a whole. . . . We are satisfied that both of these conclusions are supported by the record. We affirm the decision of the Court of Chancery to certify the Dana action pursuant to subsection (b)(2) of Chancery Court Rule 23."
564 A.2d at 1096-97 (emphasis in original; citations and footnotes omitted). The court proceeded to hold that, in such a case, a chancery court could, in its discretion, allow a member of the class to opt out:
 "We have concluded that when a portion of the relief which is sought is monetary, a member of a class certified under rule 23(b)(2) has a Constitutional due process right to notification[28] but not a right to opt out of the class. . . . Nevertheless, the Court of Chancery has discretionary power, under its Rule 23(d)(2)[,] to provide for an opt out right and to require that notice thereof be given, if it believes that an opt out right is necessary to protect the interest of absent class members. . . . In exercising its discretion, before deciding whether or not to extend an opt out privilege as part of a subsection (b)(2) certification, the Court of Chancery must balance the equities of the defendants' desire to resolve all claims in a single proceeding against the individuals' interest in having their own day in Court. The ability to opt out of the class always involves the potential for a multiplicity of lawsuits and variations in adjudication which class actions are intended to prevent.
564 A.2d at 1101 (citations and other footnotes omitted). The Supreme Court of Delaware held that the Court of Chancery did not abuse its discretion in its decision "not to afford Nottingham the right to opt out of the Dana class action."Id.
The Supreme Court of Delaware has thus provided a vehicle for challenging a non-opt-out certification and for obtaining a discretionary exclusion, of which these plaintiffs did not avail themselves. If any of the plaintiffs here had challenged Chancellor Allen's order on appeal, the Supreme Court of Delaware might well have reversed on the authority ofNottingham Partners. Instead, most of these plaintiffs affirmatively indicated their willingness to participate in theHynson settlement. Many of them returned W-9 forms to avoid backup withholding of federal income tax from the settlement proceeds they were to receive. Others filed proof of claim forms. All of them received notice by first class mail, but none of them objected to the settlement. The majority of these plaintiffs are sophisticated investors, and virtually all the rest of them had the benefit of the efforts on their behalf undertaken by the Shareholders' Protective Committee in response to Drummond's 1983 merger attempt. Under these circumstances, we cannot say that these plaintiffs were deprived of notice and an opportunity to be heard or that the procedures in the Delaware court fell so far short of "fairly insur[ing] the protection of the interests," Hansberry v. Lee,311 U.S. at 42, 61 S.Ct. at 118, of the absent class members as to make it unnecessary to request in the Delaware court that they be excluded from the action.
 VIII.
We are not sure how far Shutts and Shaffer reach in this situation; indeed, the United States Supreme Court, as we readTicor, seems unsure of the reach of Shutts. Clearly, Shutts
requires, in a class action for monetary damages, opt-out rights for class member *Page 947 
bers who do not have sufficient contacts with the class action forum.[10] Just as clearly, Shaffer disallows the exercise of jurisdiction quasi in rem when the property is unrelated to the cause of action and the defendant does not have sufficient contacts with the forum. However, Shaffer is unclear as to whether the ownership of stock in a corporation incorporated in the forum state would support jurisdiction over the owner in an action alleging deprivation of rights arising out of that ownership. Even if it would not always support such an exercise of specific jurisdiction, we, like the Third Circuit in Grimes, hold that the plaintiffs' stock ownership, together with their activities indicating a willingness to participate in the settlement, established the necessary contacts and made it fair and reasonable under all of the circumstances for the class action court to exercise jurisdiction over their claims.
 IX.
The foregoing discussion sets forth our conclusion that the plaintiffs in these present cases who had sufficient contacts with Delaware in connection with the Hynson proceedings are barred from relitigating the claims settled in Hynson. This answers the claims of most of the plaintiffs, and it may answer the claims of all plaintiffs. However, we are left with the possibility of remanding the cause for individualized findings as to any plaintiffs who may not have established any contacts with Delaware other than the holding of ABC stock. Under the facts and circumstances of this case, we do not find it necessary for such individualized determinations.[11]
Some constitutional rights may be waived if not timely asserted.
 "[A] failure to assert constitutional rights at the appropriate time and place constitutes a waiver of those rights. City of Huntsville v. Gudenrath, 194 Ala. 568, 69 So. 629; City of Birmingham v. Wills, 178 Ala. 198, 59 So. 173; City of Mobile v. Smith, 223 Ala. 480, 136 So. 851. It was stated by the Court in Vernon v. State, 240 Ala. 577, 200 So. 560, cert. den., Vernon v. Wilson, 313 U.S. 559, 61 S.Ct. 837, 85 L.Ed. 1519:
 " 'So also, * * * one may waive and does waive his constitutional rights if he fails to assert or claim them at the appropriate time and place and according to the established course of procedure.'
 "In Alabama Cartage Co., Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen, 250 Ala. 372, 34 So.2d 576, 2 A.L.R.2d 1273, the following statement of the rule of waiver was approved:
 " ' "A party may waive a rule of law or a statute, or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter of private right, and no considerations of *Page 948 
public policy or morals are involved, and, having once done so, he cannot subsequently invoke its protection." ' "
Barnes v. State ex rel. Ferguson, 274 Ala. 705, 711,151 So.2d 619, 624 (1963).
An objection based on a lack of jurisdiction over the person may be waived by appearing and not contesting the court's jurisdiction. Rule 12(h)(1), Ala.R.Civ.P., provides:
 "A defense of lack of jurisdiction over the person . . . is waived (A) if omitted from a motion in the circumstances described in subdivision (g), or (B) if it is neither made by motion under this rule nor included in a responsive pleading or an amendment thereof. . . ."
See 2A Moore's Federal Practice, ¶ 12.23 (2d ed. 1991). See also Rule 12(b)(2), motion raising defense of lack of jurisdiction over the person, and Rule 12(g), consolidation of defenses in motion. This rule, of course, is stated in regard to a defendant, as to whom the question of in personam
jurisdiction is ordinarily presented. It does not apply neatly to an assertion by a person who was an absent member of a previously pending class action, because it is not ordinarily contemplated that absent class members will enter appearances or raise "defenses" of lack of jurisdiction over the person. However, we conclude that any objections by any of the present plaintiffs to the Hynson court's jurisdiction over them have been waived, for the following reasons: all of the absentHynson class members received notice of the action and of the pending settlement; the Hynson court had at least colorable jurisdiction over the absent class plaintiffs, because they were stockholders of the corporation whose stock was the subject of the class action; Delaware, as stated in NottinghamPartners, provided a discretionary right to opt out even of class actions certified under Rule 23(b)(1) or (b)(2); and none of the absent class members in Hynson expressed any objection to the settlement or any interest in exclusion from the action until long after it was settled and after an independent but related appraisal action reflected a higher value than the settlement gave. The interest of these plaintiffs in opting out of Hynson arose only after the much higher stock valuation ofNeal gave them, in hindsight, a dissatisfaction with the Hynson
settlement. Thus, we hold that, in the circumstances of this case, the doctrine of res judicata bars the plaintiffs' relitigation of the claims that were settled in Hynson.
For the foregoing reasons, we conclude that the judgment inHynson is binding on the plaintiffs. The summary judgment is due to be affirmed.
AFFIRMED.
MADDOX, SHORES, COOK, and BUTTS,* JJ., concur.
[1] By an amendment to the complaint, the plaintiffs alleged that they were not barred by the Hynson judgment because their interests had not been adequately represented in that action, but they do not make that argument on appeal.
[2] Market trades for ABC stock in 1984 before the tender offer ranged between $48 and $55. These and the above figures for market trades were included in the tender offer circular.
[3] Drummond and its subsidiary.
[4] The appeal of Neal is reported as Alabama By-Products Corp. v.Neal, 588 A.2d 255 (Del. 1991).
[5] Significantly fewer persons were actually involved, because, for example, numerous plaintiffs were named individually and as trustees of several trusts.
[3] "Our holding today is limited to those class actions which seek to bind known plaintiffs concerning claims wholly or predominately for money judgments. We intimate no view concerning other types of class actions, such as those seeking equitable relief. Nor, of course, does our discussion of personal jurisdiction address class actions where the jurisdiction is asserted against a defendant class."
[6] A question similar to the one presented here was recently presented to the United States Supreme Court — "[w]hether a federal court may refuse to enforce a prior federal class action judgment, properly certified under Rule 23, on grounds that absent class members have a constitutional due process right to opt out of any class action which asserts monetary claims on their behalf" — but the Court dismissed the writ of certiorari as improvidently granted. Ticor Title Ins. Co. v.Brown, ___ U.S. ___, ___, 114 S.Ct. 1359, 1361, 128 L.Ed.2d 33
(1994).
[7] "Absent class plaintiff" refers to a plaintiff who is not a named party, not necessarily to a plaintiff who is absent from the jurisdiction. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115,85 L.Ed. 22 (1940); 1 H. Newberg and A. Conte, Newberg on ClassActions § 1.02 (3d ed.).
[6] "The state of Delaware is the situs of ownership of all stock in Delaware corporations. Del. Code.Ann. tit. 8, § 169 (1991)."
[8] Instead, the action alleged mismanagement by the defendant directors and officers of the corporation's business, leading to substantial liabilities of the corporation. The Court cited the fact that several of the defendants did not own stock in the corporation and thus were not brought into court in Delaware through the sequestration procedure as evidence that the claim did not in fact relate to the ownership by most of the defendants of stock in the corporation.
[9] The Third Circuit relied on Holbrook's tender of his shares as the additional element establishing the necessary contacts. Here, all of the plaintiffs either tendered their stock in response to the tender offer or surrendered them in the merger. They argue that these acts did not establish sufficient contacts with Delaware, however, because the tendering shareholders were to deliver a letter of transmittal either by mail to New Jersey or by hand in New York. Alternatively, the shares could be transferred by book entry in New York. None of this, they say, established sufficient contacts with Delaware. The defendants do not respond to this argument, so we do not rely on the tender as establishing the necessary contacts.
[10] We have examined numerous cases, treatises, and authorities applying or discussing Shutts, and we find none inconsistent with the result we reach here. See, e.g., Brown v. Ticor TitleIns. Co., 982 F.2d 386 (9th Cir. 1992), cert. dismissed, TicorTitle Ins. Co. v. Brown, ___ U.S. ___, ___, 114 S.Ct. 1359,1362, 128 L.Ed.2d 33 (1994); In re Real Estate SettlementServs. Antitrust Litig., 869 F.2d 760 (3d Cir.), cert. denied,493 U.S. 821, 110 S.Ct. 77, 107 L.Ed.2d 44 (1989); ColtIndustries Shareholder Litig., 77 N.Y.2d 185, 565 N.Y.S.2d 755,566 N.E.2d 1160 (1991); Carlough v. Amchem Products, Inc.,10 F.3d 189 (3d Cir. 1993); 1 H. Newberg and A. Conte, Newberg onClass Actions, §§ 1.14-1.23 (3d ed. 1992); 7A Wright, Miller, and Kane, Federal Practice and Procedure: Civil, § 1757 (2d ed. 1986); 7B Id., § 1789; A. Miller and D. Crump,Jurisdiction and Choice of Law in Multistate Class ActionsAfter Phillips Petroleum Co. v. Shutts, 96 Yale L.J. 1 (1986).
[11] The plaintiffs correctly point out that a "minimum contacts" test for whether an absent class plaintiff who was not allowed opt-out rights can collaterally attack the judgment will lead to uncertainty in class settlements. However, with Shutts as the dispositive law on point, the only alternative would be to say that, in any plaintiffs' class action for monetary damages, if no opt out rights were given, all absent class plaintiffs (except, presumably, those who have accepted settlement proceeds and signed releases) can collaterally attack the judgment. If the Shutts rule is not a matter of in personam
jurisdiction, it seems that residents of the forum state and others with ample contacts would not be bound by a class judgment unless they were expressly given the right to opt out. We decline to hold that due process requires such a broad right of collateral attack regardless of contacts with the forum and regardless of other protections that were given the absent class members.
[28] The right to notification affords the absent class member an opportunity to ask the court to afford it a right to opt out of the Rule 23(b)(2) class if such a right was not provided for in the notice. See [Fed.R.Civ.P. 23 Advisory Committee's Note (1966), reprinted in 39 F.R.D. 95 (1966)], at 106-07. In this case, Nottingham was able to make such an argument. Moreover, since it was notified of the proposed Settlement, prior to the class certification, in addition to objecting to the Settlement, Nottingham was able to argue the merits of the decision to certify the Dana action under subsection (b)(2) instead of subsection (b)(3)."
* Although Justice Butts was not a member of this Court when this case was orally argued, he has listened to the tape of oral argument and has studied the record.